Thank you. Thank you, Your Honor. Stephen Fischbein for the petitioner 1-800 Contacts. Your Honors, ten years ago, my client 1-800 Contacts settled a trademark infringement lawsuit here in the Southern District of New York. The parties agreed that neither would use the other's trademarks to trigger paid Internet search ads. Like dozens of other settlements entered every day in this courthouse, the parties believed that their dispute had been put to rest and would not be second-guessed years later. First, these settlements were arm's length and in good faith. The FTC concedes that. And in this case, that is a significant issue. There was an extensive factual record here. The FTC interviewed, deposed, and called as witnesses the counterparties to these settlements. If there was any suggestion of collusion or that the trademark issues were pretextual, that would have come out. It did not. These are nothing more – Let me ask one question about the New York settlements. One feature did strike me as unusual, which you didn't mention. One of the provisions of the settlement is that the competitor is – how to put it without a double negative, I guess – is required to use your trademark as a negative term in bidding on search results. Are you aware of other cases in which a trademark settlement involves something like that? I mean, there's an interesting issue about whether it's a use of the trademark to bid in this kind of auction on your trademark, but I wouldn't have thought it was an interesting issue that someone can't bid on advertisements that use the word contacts or contact lenses without explicitly disavowing an interest in appearing on any – on the page, results page of anybody who puts in your trademark as the search term. Let me address that, because there's a number of points there. First, to be clear, there were no terms like trademarks. The settlements were all very clear that the competitors could run their ass if somebody searched for contacts or contact lenses or a generic term. Yes, but with the disavowal that the bid would not cover your – people who used 1-800-CONTACTS as their search term. Yes, and that's a corollary to the non-use provision that's necessary to protect the trademark. And let me explain the mechanics. One way of – if I'm a competitor running my ad against 1-800-TRADEMARKS is to go to Google and say, I will pay you if you run my ad against 1-800-CONTACTS. Now, I can also bid on the word contacts. I have a – I understand the mechanics, but I'm trying to understand – you know, you don't have – it seems to me – correct me if I'm wrong, I may not understand trademark law fully – you don't have a right to have people not use 1-800-CONTACTS in comparative advertising, right? Someone could say on a billboard, we're cheaper than 1-800-CONTACTS, right? Correct. And if there were such a thing, if there were an app where you could look for every billboard in the country that has a 1-800-CONTACTS number – ad – and then make it your business to rent the next billboard on the road to have such an ad, there's nothing wrong with doing that, is there? Not that I'm aware of. So why – and let's assume that it is not just a good faith thing. Let's claim – let's say it's right – that those practices are distinguishable from bidding on your trademark as a search term. At least in that instance, the competitor is using, in some meaningful sense, your trademark in negotiating with Google. It strikes me as a bridge quite a further to say they're required to somehow avoid any bid that would land their ads there, even if they're bidding generically. Your Honor, what I want to explain is it's still using because the advertiser has a choice as to whether to just bid on CONTACTS with exact match or to say to Google, I will pay you extra if you run my ad on any search that includes CONTACTS knowing that that will pick up 1-800-CONTACTS. Of course they know that. Part of that is the problem with the fact that your trademark is not a strong mark, or maybe the whole thing is a mark, but you're utilizing a generic term in a way that is, if you give it as broad a sweep as you're thinking about, gives you a lot more than you may be entitled to. It's a valid trademark. No one's challenged it. There are methods to challenge a trademark, but it's so long – I know, but if you were Kodak, they wouldn't be able to do this to you by bidding on film. I mean, I'm an old guy. I remember when there was Kodak and there was film. They wouldn't be able to do this to you. It's really just because your trademark encompasses the very generic term. So I'm having a little trouble understanding that aspect of the settlement as to why that would be a legitimate thing. I mean, I don't think you even – I mean, the lawsuit that was settled was about, I thought originally, the claim – and maybe I'm wrong about this too – was about their affirmative use of your trademark. There were cease-and-desist letters, obviously, with a number of settlements, but this broad matching issue was definitely – Definitely raised, okay. But look, the confusion is that when a searcher puts in 1-800-CONTACTS expecting the results to be related to that, something else comes up for a competitor, and that's what the courts have said is potentially confusing. Functionally, it's exactly the same if I do broad match with contacts knowing that's going to pick up 1-800-CONTACTS as if I bid on 1-800-CONTACTS directly. It's functionally the same, and unless you have the negative keywords, the result is going to be the same. But why is the result problematic? What is problematic is their use of your trademark. Turning to use, turning to use, I would say, why is it not a use if I'm Memorial I – that's an actual counterparty – Memorial I testified in the FTC. They were asked, did you run trademarks on 1-800-CONTACTS? Answer, yes. Did you direct bid? No. How did you do it? Well, we bid for 1-800-CONTACTS. Generally, the law does not allow you to do indirectly, which are prohibited from doing directly, and if the intent of the party is to run the ad against 1-800-CONTACTS… The intent is in all of the billboard examples is to run an ad against your ad. Right. The issue with the billboards is I think courts would generally say it's not confusing because people in the physical world are well-equipped to differentiate two different suppliers. Even an old guy who's old enough to remember Kodak and film knows that the first four things you get on Google, which are labeled ad, you should disregard and move down to the next thing if you're looking for something specific. Everyone knows that. Yeah. But is that the standard? Everyone has to know that? I mean, no. No, no, no, no. I mean, in 20 years from now, we're not – when all of our kids are up there and doing this stuff, we're not even going to be having this conversation. And perhaps in 20 years, the situation will be different. But the courts that have ruled on this, and certainly back in 2004 and 2009 when we were doing these settlements, the courts ruled that it can be inherently confusing to run an ad against somebody else's trademark. And these comparisons to the physical world only go so far. I mean, I think people, again, are well-equipped to know what store they're walking into. Whether it's a Starbucks or it's the Java Joe next door, you kind of have a sense of where you are. The Internet is different. It is confusing. There are surveys after survey, some of them cited in the cases like Rosetta Stone. People do not know the difference between advertisements and organic results. You said a moment ago that the competitor has a choice between doing the broad match or including the keywords. So is there a difference in what they're choosing to advertise on? Do they pay a different price if they have the exclusionary keywords, or is it just an extra disavowal of certain search results? The price depends on who else bids. So I don't think the price varies based on specific match or broad match. And only varies based on the generic keyword that you're bidding on. Right. The exclusionary keywords don't factor into the price. It factors in the following way. If you suggest broad match, your ad will be paired against many more search terms. So in effect, you're saying, I'm willing to pay more. If I do just contacts, my ad only runs against people who put in exactly contacts. Are you only bidding against people who also have the exclusion for 1-800, or you're bidding against everybody who does contacts? So if there are two bidders, one is just contacts, broad match, but no exclusion of 1-800, and somebody else is bidding against contacts but has an exclusion for 1-800, are they bidding against each other? I don't know the answer to that, Your Honor. I'm not sure the record reflects that. But I would point out that it is an affirmative choice by the advertiser to do broad match. They're likely to pay more for that because it's going to match against more ads, and that's the way they pick up 1-800 contacts, by bidding on contacts. Your Honor, you asked if there were other cases. There are, and we cited, and they're in the Hogan report, which is in the appendix, and we cited them in our brief. There are several cases of default judgments or consent judgments, okay, where the courts did impose negative keywords. I think we cited four or five of them. And so those courts obviously viewed the negative keywords as part and parcel with the direct bidding. And the FTC is taking the same position. An oral argument in the FTC, one of the commissioners asked FTC counsel, there's two different issues here, isn't there? There's direct bidding, and then there's the negative keywords. And FTC counsel responded, it's a distinction of degree, not of kind. We obviously did not make a demonstration of what the effect would have been had there been no negative keyword requirement. So their proof of impact, of effect, of everything was of the two things combined. There's no basis in the record to separate the negative keywords from the direct bidding. Maybe there should be. I mean, one of the things that I've been struggling with is assuming that we were to agree with you in broad outlines about some aspects of, you know, that this was, that the FTC's approach gave insufficient weight to the interests of trademark holders. What follows from that? What kind of relief would be involved? And maybe a possibility would be to send it back to the agency if, for example, we thought that some aspects of these settlements overreached and others did not. I mean, Your Honor, our position is the FTC had plenty of opportunity to develop the record. They chose their theories. They chose not to differentiate between the keywords, negative keywords, and the other effects. They had no independent proof about the negative keywords, and I don't think they should get it to over. I mean, we'll just keep going back and forth. But let me address a threshold issue. Before you start this, just, I'm trying to avoid doing what I did yesterday, so I'm going to give you another eight minutes, and we're going to give the government another ten since you're now two minutes over. And we'll watch the clock. Okay. Thank you. Thank you, Your Honor. I think that at the threshold, this case is really controlled by this Court's decision in Clorox and the Supreme Court's decision in Activist. In Clorox, the Court said that trademark settlements are favored in the law because they are non-exclusionary and that absent evidence of some auxiliary purpose, in other words, that the trademark settlement is ancillary to some other illegal agreement, they should be respected. Those conditions are clearly present here. As I said, clearly non-exclusionary. This applied to one very narrow type of paid Internet advertising, which is trademark advertising. The competitors were free to get their message across through bidding on generic terms, through social media. There's many, many different channels. Generic terms, organic, display ads, social media, product listing, email ads, mobile apps, not to mention non-Internet advertising like print, radio, and TV. So it didn't foreclose anybody selling whatever products they want, any prices they want. In the terminology of the competition, the effectiveness or efficiency with which some of these competitors could get their message across, but that flows from the trademark rights. And by no means were people barred or prevented or really limited in any way in getting their message across. So how do we understand the record? This may be shifting gears very slightly, but what is there that essentially indicates – sorry, I'll back up. It seems to me the FTC looked at whether there was sort of advertising and the amount of advertising that went on and tried to use that as a proxy for limiting the market or the market having been limited. Can you focus on that for a second? I can. What their experts looked at is whether the number of advertisements that ran against the 1-800 trademark went down or were lower than they otherwise would be. Since the whole purpose of the agreement is to say you can't advertise on the 1-800 trademark, we don't disagree with that. Clearly that was the effect. That was the intent and that was the effect. But that doesn't mean that the overall body, the overall volume, the overall messages of advertising to consumers was reduced, because there are so many other channels. And a number of these – And it seems to me that Google searches are different. Everybody uses either Google or some alternative search engine to find out what's on the internet. And those companies, rather annoyingly to the consumer – but that's the price of getting a free service, I guess – have stopped matching my search with what is actually most connected to my website. And instead stick in something that they sold up front. That becomes, it seems to me, an almost uniquely significant way of hitting consumers, right? I mean, the real thing you're worried about is if somebody is saying we're cheaper than 1-800 contacts, what place they could advertise is more likely to hit the consumer who is either contacts in general or 1-800 contacts as a search. Again, if they put in contacts, they will see the competitor ad. If they just put in contacts, they see it. And the record showed, according to Google's information, that during the relevant period, there were over 1 billion paid search – I'm just limiting it to paid search. We're not talking about display ads or social media or anything else. One billion paid search ads for contacts run by 1-800 competitors during the relevant period. So that means between generic terms, between searches for their own trademarks, easy contacts or whatever it is, through people searching for AccuView, they were able to get the message across. You were going to say a moment ago that this case is controlled by Clarks and also Actavis. And I assume what you were going to say about Actavis is the court said that common settlement forms have not been sought for that reason of taking that form to be subject to an interest liability. But so the commission says that Actavis only says liability, and it doesn't mean that these settlements are immune from any kind of scrutiny. And they say that you should be able to give your pro-competitive justification that it's a settlement, and they would take that into consideration at that stage of analysis. Does a lot hinge on where it comes in in the analysis? What is the difference between those two positions? Let me address it this way. Yes, I think you characterized our position correctly. I would say that the key issue from Actavis is that when the FTC briefed it and when the Supreme Court made that reverse payment unusual was that it was beyond the scope of relief that any party could get if they had prevailed in litigation. Whereas here, and this is critical, every single one of these provisions in these settlements has precedent in other cases where courts have and did order non-use, including negative key terms. My question is if we say that this is a commonplace form of an IP settlement, does that mean that they don't even get to make a prima facie case, or it means that that is the pro-competitive justification and they can't overcome it? Does anything hinge on that distinction? Yes. I think there's a couple of ways that could come up. One would be like at the motion to dismiss whether there's immunity. And I think they overstate it when they say we're asking for immunity, because here there was a full factual record. What we're saying is when the full factual record shows that it's arm's length, good faith, non-exclusionary, and within the scope of what you would have gotten in litigation, then there is no anti-competitive effect. So you don't get past the first prong. There's no pro-competitive justifications. As in Clorox, you simply say that is not in effect. That's an effect that flows from a legitimate trademark, and that is not recognized as an anti-competitive effect for antitrust law, which is I think the way they did it in Clorox. And what is the threshold for non-unusualness? If there are – I mean, there are certain kinds of trademark settlements and claims that are absolutely standard. We see hundreds of them in this circuit annually, I'm sure. Other kinds, you said, well, there are a couple of cases or four cases that you cited where this kind of – at least the negative keyword was – Many more on the non-use. Many more on the non-use. But does that – does that make them usual or unusual or just novel? And what difference does that make? I mean, in other words, I'm not trying to tax you necessarily with the idea that you've done something unheard of when thousands of cases have not reached that far. But neither, it seems to me, are you able to say this is something that's an everyday event. This is something that's novel. I don't think it comes down to whether it's typical or the percentage of cases. I think it comes down to whether it's something that you legitimately could get, whether it is a plausible form of relief. And note that in Activist, the parties didn't even try to say that this reverse payment was something they could have gotten litigation. The way they justified it was that the brand – the generic was providing services, that there was some extra patent agreement. Here, I don't think there's any dispute that if we had been successful and numerous courts recognized the initial interest confusion trademark theory, if we had been successful, we would have been entitled to an injunction that said you cannot use our trademark for advertising and a negative keyword. So the question is simply, is it in the scope of relief that you could have gotten had you had the clear consensus that decisions were in your favor, but even if it was an open question, if you were successful, could you have gotten that? And once we establish that and that it's good faith, arm's length, it's non-exclusionary, there's no reason to go – Do you determine what relief you could have gotten without evaluating the plausibility of the claims or sort of looking into how strong the claims are? You don't reassess the facts because I think the idea is that you presume that parties acting at arm's length are in the best position to assess their factual position. You say, assuming 1-800-CONTACTS factual claims were true and both parties apparently thought they were true enough to reach the settlement, then as a matter of law, is this something that they plausibly could have gotten? And the answer clearly is yes from the precedent. But there may also be a question of legal theory, right? There is. And in all of these cases, it's fine to say that the parties are in the best position, but we all know there's a difference between big parties and little parties. There are such things in the world – I would certainly not suggest that you are one – who are trademark bullies, who sue people and then push them into all kinds of things. It wouldn't necessarily be an antitrust problem, whatever they push them into, but the bargaining power makes a difference. So like Judge Menashe, I guess I'm a little concerned about this question of is there – there's a long stay, there's a long range between the sham collusive settlement that never was a real litigation. The parties just used that as cover to enter an agreement they wanted to enter into for antitrust purposes, to suppress competition. And there's a long way between there and good claims. So where along the way is there no evaluation of what the underlying law might be, particularly in novel areas? Your Honor, let me address the first point because one of the settling parties was Walgreens, which is 200 times bigger than 100 Contacts on a revenue basis. Another one was Lens.com, which is not a big company, but felt they had a strong factual position and litigated against us and won. So clearly it was open to these counterparties to resist the ones that settled, settled because they wanted to settle. There are other grounds to get behind a settlement other than sham. As Clorox says, if the trademark agreements are ancillary to some other illegal purpose, and they cite for that proposition a case called Timken where people divided the market and subsequently came up with trademark agreements to kind of paper over a market division, and the court said, look, the trademark issues here are ancillary to what was otherwise agreed and unstated. So the courts can test settlements to see whether they're truly arm's length. Obviously, if there was duress or something like that, you could get into that. And that's why I say it's so important that in this case all of these counterparties testify, and there wasn't a hint of overbearingness or duress or anything like that. They all said we settled because we evaluated the position. We didn't think it was worth spending the litigation costs in light of the risks that we faced. For this court to go behind that and to start second-guessing parties' sincere, legitimate evaluation of where they stand on the law, I think that's a dangerous game, and that's something that's been cautioned against in activists, Tamaxifen, Clorox, you know, many of our cases. Thank you, Mr. Fishbein. You've reserved two minutes for rebuttal. Thank you. And you will probably end up with more as you continue. Thank you. Thank you. And why don't we give the government 25 minutes at least to start, and we'll see how far beyond that we can go. Thank you, Your Honor. Good morning. Imad Abyad for the Federal Trade Commission, and with me at the table is my colleague, Barbara Blank. Let me start out by demonstrating why this case is in fact not about trademarks. The law protects trademarks to the extent that there is a likelihood of consumer confusion. These agreements, 14 of them, covering nearly 80 percent of all online sales of contact lenses, banned ads that did not, could not have been confusing. It banned ads that did not use the trademark at all. One of them, the Lexarica Agreement, did not even involve trademarks and was not even a settlement of litigation. It was a simple supply agreement that 1-800-BAN. We'll have a separate argument about the supply agreement. Maybe it should be evaluated differently. But on the settlement agreement, it isn't saying that there's no possibility of confusion. I'm just assuming the outcome of litigation. So in your brief and with the arguments complaint counsel made before the commission, they said it doesn't matter the strength of the claims underlying. We're not litigating the underlying trademark claim. And if what was at issue in the underlying case is whether it was confusing, if you're telling us to rely on the premise that it was not confusing, aren't you then saying that we need to look behind those claims and the settlements and re-litigate the underlying case? Fair question, Your Honor. No, we're not asking the court to look behind the claims to see whether they are confusing or not. The provisions in the agreement banned ads regardless of the content of the ads. An ad that starts out by saying we are not. Wasn't the theory of the suit that it's confusing to somebody if they Google 100 contacts and the first search result, even though it says ad somewhere, the first search result is a different company, somebody will think that that is the most responsive result to their search and they think it's 100 contacts. Isn't that the theory of confusion? Absolutely. Didn't we even say in the Rescue Count case that that states a plausible theory of confusion? To the extent that Rescue Count said that using the trademark as a search keyword is a use of the trademark, yes. We also said that there were sufficient allegations of confusion to withstand a motion to dismiss. A motion to dismiss, absolutely. I understand we didn't adjudicate it to the end, but we did say that basic theory that you Google a search term, 100 contacts, and the first result is something else. You might think that you're getting to 100 contacts when, in fact, you're not. Absolutely. In theory, Your Honor, that's correct. In practice, however, the FTC expert testified that he has reviewed over 100 opinions involving the search term confusion. Not a single case, not one, based liability for trademark infringement on that theory. It's also the case that even if that is... Apparently settled when they were faced with this. Oh, right, right. No, we're talking about not the ones that settled. But that's my point, that that, in fact, you're right on the theory. But in practice, that's not the case because at minimum, at minimum, 1-800 could have just said, look, if there's an ad that says we are not affiliated with 1-800 contacts, that's the first thing you see in the ad. That ad is banned under their agreements. It gets there via the search term. Exactly. And so even to the extent, we can see, let's say there is, in fact, de minimis confusion based on that theory. If there is de minimis confusion, there are ways to deal with that to protect the trademark. It's a different thing, isn't it? So if I've already clicked on the ad that I'm at another website, and so the disclaimer is addressing whether I'm confused as to which website I'm at. But if we're talking about a theory of initial interest confusion, which is how the courts described it, then it's when I see the ad in response to the query, whether I'm confused if it's responsive to my query. Isn't that the theory? Is that cured by the disclaimer that you're talking about? I would think, Your Honor, it would be cured. If I type in 1-800 contacts into my search engine and I see the first link that is displayed, ad or not, the first link that is displayed in conspicuous font says we are not affiliated with 1-800 contacts. Could that really be confusing? You're saying so this one-line ad that's in Google, it should say lens.com, discount contacts, capital letters, not affiliated with 1-800 contacts. Or it could be, I mean... It's a less restrictive... It's far, far less restrictive, Your Honor. Far less restrictive because what 1-800 has done is if I put in the terms 1-800 contacts into a search engine, 1-800 is claiming that digital space as its own exclusive territory and has agreed with its rivals that they would not advertise in that territory and vice versa. This is exactly like Blackburn v. Sweeney out of the Seventh Circuit where lawyers, former law partners, agreed not to advertise in each other's regions. And the Seventh Circuit found that per se unlawful. That's an interesting thesis and that leads to the question, so how come 1-800 contacts is on the downside of the V and none of the people who signed agreements with them? In other words, you're not charging the other competitors with entering this agreement to not enter each other's space. Well, Your Honor, because 1-800 contacts is far and away the largest player. 1-800 contacts is the common denominator in all 14 agreements. They're the ones that are in fact insisting on these provisions. And contrary to what my colleague has said, there are, in fact, in the record, there is evidence of what you would call trademark bullying. If the court wishes to review that, it's at transcript 242 to 244 and transcript 1931 to 1934. So I can't speak to why the complaint counsel picked one defendant versus another. But certainly in practical terms, you could see why one... There's no allegation that this is a sham. They don't think this is a sham. No, no. We're not saying there's... Absolutely. We're not saying that they are a sham. It's not really like a division. In effect, you're saying it's like a... In effect. But for the presence of trademark, these are per se illegal. They're market division agreements and they're bid-rigging agreements. They've agreed not to bid against each other in online auctions. So the only issue is whether they are trademarks. Well, but that's precisely the issue, right? I mean, I assume we'll hear, if I'm wrong about this, that 1-800-CONTACTS would also agree that agreements like this outside the scope of trademark would be unlawful. These are outside the scope of the trademark, Your Honor. How deeply do we need to get into trademark law to decide that? Perhaps no more than what are the three elements of trademark infringement. You need to have a protectable trademark. They have that. There needs to be a use that's unauthorized. There needs to be a likelihood of confusion. On those last two, what the Commission found is these agreements go way beyond those because they banned agreements regardless of ads, whether they could be or could not be confusing, including the initial confusion theory. And they also saw that the agreements banned ads that did not use the trademark. As Your Honor mentioned, the negative keyword provision, that's what that is. Aren't you right in evaluating the strength of the claims and the underlying litigation? You just told me that we don't have to do that to resolve the case. Well, what I said is you don't need to get into the merits of the claims, but if the issue is did you meet an element of the trademark infringement, to that extent, yes. I think that's fair enough, but that does not involve much. The argument is actually that the underlying claims were so frivolous they don't even meet the element of trademark infringement. Not so much that they're frivolous. It's that our issue is not with the trademark claim that they have. Our issue is with the agreements restraints. We're saying that the restraints in the agreements went far beyond what the trademark claims. So if the claim is when you Google 100 Contacts, you're using my mark, and the fact that your ad comes up as the first result means that a consumer is going to be confused and think it's 100 Contacts because it's responsive to the search, therefore you're infringing. And the restraints say, well, you can't use the trademark in that way, and you can't appear in that place. So if you're telling me that those restraints just don't match any valid trademark claim, you're telling me that the initial trademark claim is not valid too, right? No, Your Honor. I'm sorry. Let me clarify. Let's assume that there is, in fact, some confusion from the initial impression of the consumers, right? What the rule of reason says is once the commission has satisfied the prima facie case and then they claim that their trademark is what justifies those restraints, let's not forget there's a third step in the rule of reason, which is if you can show that those restraints could have been – I'm sorry, those justifications could have been accomplished with less restrictive means, then they also lose. But to that you're changing the argument, right? So now you're saying that there is a use of the mark and there is a potential for confusion, but it could have been avoided through a less restrictive means. No, no. There is no use of the mark when the rivals are only bidding on generic. There is no use of the mark. So they lose there even regardless of the likelihood of confusion because the rival did not use 1-800-CONTACTS at all, either as a keyword in the search or in the ads themselves. So there is no use. Well, what do you say about those courts that were cited by 1-800-CONTACTS that say, well, if you're bidding on the term CONTACTS and you have a broad match knowing it's going to capture 1-800-CONTACTS, you're basically using the mark? And courts actually ordered or approved settlements that explain that. But not a single one of them, Your Honor, was a court that actually grappled with the issue. Those are decisions where the court approved private agreements that had those provisions. That's a very different issue. Actually, that's useful as a transition. So this gets us to the Clorox question. Yes. Did they say in Clorox that in the absence of some kind of underlying legal agreement or extraordinary circumstances, we should defer to the parties' sense of what is necessary to protect trademarks? So even under that standard, Your Honor, the Commission found based on substantial evidence that those exceptional circumstances exist here. And they are? And they are. The ban applied without any reference to the content of the ads. If you recall, in Clorox, the typical settlement that was there was, in fact, very detailed about what can be used and what cannot be used in ads and how they can be used and all that. None of that is here. It's just a straight ban. That's one. Two, the term for the use of negative keywords, insisting on negative keywords when there is, in fact, no use of the trademark. Three, the restraint that applied in Clorox was one product with one rival with plenty of competition around. Here we have 14 agreements covering almost 80% of that market. Four, one of the agreements, Laxatica, was a supply agreement. It involved no trademarks, and it involved no relegation settlement at all. I don't really want to take up your time about this, but I am puzzled about how Laxatica gets into this same lawsuit and this same issue. Because they agreed to the same restraint, Your Honor. In the Laxatica agreement, both parties, 1-800 and Laxatica, agreed not to advertise against each other. And they did that outside the context of any trademark claims? Correct. There were no trademark claims between them. There was no litigation. There was no threatened litigation. It's a supply agreement. And there is separate consideration of that entire subject by the commission? In other words, is there a separate finding that Laxatica, that agreement itself violates the antitrust laws without reference to these other trademark settlements? I don't know whether the commission put it in those terms, but the commission made several findings that the Laxatica agreement is, in fact, also violating the antitrust laws, and it does not involve trademarks. Okay. Let's assume, for the sake of the argument, that you win about Laxatica. Right. I don't know whether you do or you don't, and I don't know what Mr. Fishbein's got to say about that. But let's just put that to one side, because it seems to me that doesn't entirely grapple with what's happening in these cases where you have a trademark litigation being settled. Well, what it does show, Your Honor, is this is not about likelihood of confusion. This is not about trademarks. This is about 1-800 protecting its much higher price against its rivals. That's what these agreements are about. They are not about protecting trademarks, because they could have protected their trademarks with a much easier way. That would not have gone so far as to ban all ads and protect its rivals. Would it really have been more likely that a rival of 1-800 contacts would agree to put, in big letters, right in the middle of their advertising, we are not 1-800 contacts? I mean, aren't they then basically advertising for 1-800 contacts? It seems maybe they'd be less inclined to agree to that. Your Honor, it is in the record, and it's not disputed, that those rivals sold the exact same contacts. It's a commodity market. Sold the exact same contacts for much less. If I were a rival and I had the option of not putting any ads against 1-800 contacts, where it's also in the record that that is my principal means of getting customers, versus the other option is I put in an ad that says, we're not affiliated with 1-800 contacts. We can sell you the same contacts for 15% less. Which one would you take? The ad would say, in effect, we are not 1-800 contacts. We're better. Exactly. We're cheaper. But is there any indication that any of these other folks tried to negotiate for that in the settlement agreement? I don't know, Your Honor. But I don't know that it matters. The point is, if these cases, if these agreements were actually— Would you say in testimony or anything that we would have preferred that? Yes, Your Honor. Where is that? We can get you the exact sites for those. But, again, getting back to it, if, in fact, these agreements were just about protecting 1-800's trademark as opposed to protecting its market, there would have been much better ways to do that. So a question about the market. So you said a moment ago that the agreements covered 84% of the market. Almost 80, 79%. The market definition question, right? Yeah. That's 84% of the market for online sales. Online sale of contact lenses, correct. And so the ALGA found that that's a separate market. Correct. The Commission seemed to adopt that finding but doesn't seem to rely on it very much. So, I mean, is there an analysis? Like, do we think that the sellers of online sales are not at all constrained in setting prices by the price of the sellers in brick-and-mortar stores? Like, these are two separate markets? They are two separate markets. Absolutely, Your Honor. That's what the ALGA found, and that's what the Commission adopted for purposes of its analysis. And it did, in fact, rely on it. If I may say, on page 2 of its opinion, it says, we find that the agreements harm consumers and competition for the online sales of contact lenses. On page 34, it says, while the contracts do not prevent all advertising for the online sale of contact lenses, it does foreclose a major channel of competition. Isn't 100 Contacts' whole business model trying to capture consumers who are going to the brick-and-mortar retailers and telling them, hey, it's cheaper to buy online? Yes, absolutely. Isn't it sort of artificial to say that they're only in this online market and that's different from the physical market, the market of brick-and-mortar stores? Well, it depends on for purposes of what. But for purposes of these agreements, all of those rivals were in the online market. They were not in the brick-and-mortar market. Right, but when we're talking about whether 100 Contacts had super competitive prices or was raising price or something, isn't the price in comparison to the other online retailers also, if their whole model is to compete with the brick-and-mortar stores, shouldn't we take into consideration what the price in that market was, too, or think of that as one market? With the brick-and-mortar? No, Your Honor. The ALGA made nearly 100 findings that defined the online sale of Contact Lenses as its own relevant antitrust market. So it's in that market that we are evaluating the restraints, and it's in that market that the Commission found that but for the restraints, the prices would have been lower. What's the reason why I should think of these as two separate markets, even though the whole idea of 100 Contacts, which I think is in the record, was to try to capture the consumers of the brick-and-mortar stores? Well, Your Honor, the initial decision in the findings 397 through 490 goes through all the factors that are in brown shoe. So it talks about how the retailers in that market view themselves. Do they view themselves as competing against brick-and-mortar? Your Honor, I grant you what you're saying, that 1-800's business model is to price lower than the brick-and-mortar, but not entirely all of it. What they do is they price lower than the independent eye care professionals and not quite as much as places like Costco, for example. But that is how they started. But that's not where the market that we're talking about now is. It's about online sales because all of the 14 rivals that they've entered into agreements with, they sell online. That's what they're talking about. Even if those rivals are thinking about themselves as only competing for the online market, if 1-800 Contacts is half of the online market and does not think of itself as only competing in the online market, then... But vis-à-vis those... Remember, the restraints we're talking about... Right. We're not saying that there could not be a relevant market that also includes the brick-and-mortar. Absolutely, that could also be a relevant antitrust market. But for purposes of these restraints and these agreements, the question is, is the online sale of contact lenses a relevant market? And the ALJ, again, in very detailed findings, found that it is, in fact, a distinct and relevant antitrust market. So... Is it an issue between the majority and the dissent over whether the majority adequately defined... I mean, in the commission decision, whether the commission adequately defined a market? Well, what the dissent... Does your position depend on the finding that online sales is a distinct market? No, Your Honor. And the reason... No. So this discussion... Well, it's not that... It's a little bit nuanced, I guess I need to say. Because let me also highlight that the commission found that there were actual direct effects. There was actually... The average price in the market where it was up was higher because of these restraints. And when you have direct effects, you don't need to define the market in the typical antitrust way where you show the market shares and you show the market power of the players. So for that purposes, you don't need an antitrust market. But you do need an... The direct effects were more people would buy from 100 contacts than from the sellers because you'd have less diversion from the ads. Correct. Absolutely. So when you divert sales... Direct effects, we think that there has to be some kind of showing that they're super competitive prices, right? So if really 100 Contacts was also competing with the brick-and-mortar stores and their prices are significantly less than those, then maybe they're not super competitive prices. So the market definition does seem to matter. You beat me to it, Your Honor. So what I was saying is that for direct effects, you don't need to show the detailed market analysis in the sense of shares and market power. But you do need to have an idea of what market are these people competing in. You know, they're not talking about eyeglasses. We're talking about contact lenses. And we're not talking about brick-and-mortar. We are talking about online contact lenses. So that's where these findings from the ALJ, in fact, become relevant. So the commission did... Like I said, there are at least three or four specific explicit statements where the commission references that particular market. If I may shift just very quickly to activists, one I understood my colleague to say, and I'm glad to hear that if that's what it means, that they are disclaiming that the idea of activists is that it grants them immunity from any antitrust scrutiny, that what they're talking about is, in fact, only whether it provides them with a justification after the prima facie case is set. And if that's the case, again, the commission found, based on substantial evidence, that even if, in fact, everything they say about activists is correct, and we don't agree with that, we think those statements related to the two particular examples that the dissent in activists had raised. But even if you take their theory to be correct, these agreements were not commonplace settlements for the reasons that I've mentioned before. How do you think we should tell what's a commonplace agreement and what's not? For example, in Clorox, I have no problem saying that is absolutely commonplace. The question was, is Pine Sol and Lysol the same kind of trademark and are they confusingly the same? And the parties settled and agreed that one wouldn't use the other in certain ways. All right, fine. That seems absolute garden variety. Even I understand that much trademark law. What do we do with a scenario where there is a novel kind of trademark situation? In other words, maybe the reason this is unusual is because it's dealing with a relatively new form of competition, a relatively new form of uses of trademarks. I was very impressed with the commission's footnote, whatever it is, 38, that has a long list of cases where claims like this are lost. But at the same time, I can't disregard what 1-800 says, which is if you put it back to the date, if you only look at cases that were extant at the time they were first doing this, they were bringing claims that, okay, they're novel because this is a novel situation. And it's a little harder to say, oh, this was frivolous or there's no way they could have won any of this stuff when no one knew what the rules were for these Google search ads. Fair enough. Let me start with that second point first. If that's the concern, then they should have no concern about the commission's order because the commission's order is only prospective. All that the commission was saying is these agreements we ruled today are anti-competitive. You should not enforce these agreements. So even assuming, and we don't agree with that, but even assuming that the law was in fact unclear at some point for some of the settlements, by the time they got to their own case in the 10th Circuit, I don't think that that excuse holds water. But more to the point of the... I'm just trying to understand how this interacts with the process of litigation. So you can have a legitimate settlement agreement that was arm's length and in good faith that settled a reasonable claim as of that time. But by 10 years later, we've recognized that there is a different world out there, and we do antitrust scrutiny of this, and we undo all of those agreements. You cannot enforce those provisions. That's what activists did. In activists, the settlement agreement at issue was in fact far more supportive than the 1-800 settlement agreement. A lot more of those. There were a couple of Circuit Court decisions that actually approved settlements like these. But then the Supreme Court said, no, those are in fact wrong, and that's our system of law. When you say those are in fact wrong... That the Circuit Court decisions that found those agreements to be not subject to any antitrust... This brings us back to the question of, does this become a trademark case, where we are having to decide whether their claims were or were not... Or not even were or were not. From the vantage point of the law as it is today, we would have to decide that their original trademark claims under today's law are no good? We're not asking... Again, I make a distinction between the trademark claim and what the agreements restraints did. Their trademark claims were not sharp. What the Commission found was that the agreements, that's why they were not commonplace. I think that distinction is when you have to show that the restraints are doing something more than the claims demand. Right, and that's what we showed. This is your point about they could have had the disclaimer. Right, well, it's the disclaimer... It's the disclaimer for the confusion side. There is no use at all for some of the ads that were banned. There was no use. So that's also, there's no trademark claim there at all. And there's Luxottica. Put Luxottica. But you just said there is no use of the trademark at all in the negative disclaimer situation. Now, I might be inclined to agree with that. It sounds sensible to me as a beginning matter anyway. But I'm not sure that the parties here have litigated that actually. Right? I mean, if that came up, if, like Lens.com, somebody fought that, and then we got an appeal from some decision about whether that is or isn't a valid trademark claim, we'd have to decide that. And we'd decide it based on full briefing from parties that were fighting the trademark case. You're kind of asking us to decide the trademark issues. That are there and sort of part of an antitrust case, which maybe that's fine. I mean, they brought up trademark as a justification in the antitrust case. So the commission has to look at the trademark claims. We're not saying that you do not need to know what trademarks are. Of course not. We're saying you do not need to litigate the merits of the claim. What you need to know, as far as trademarks is concerned, is what do you need for trademarks? You need a trademark, use, and confusion. I don't get the difference between this and the merits of the claim. Because when you say this is not a use, Mr. Fishbein says, no, it is a use. It's a funny kind of use, but it's a use. And would we not have to decide somewhere along the way in this case that that is actually not a valid trademark claim because that is not a use? Yes. Okay. Yes. So to the extent that, I guess, to the extent you need to look at trademark law for purposes of, say, a motion to dismiss, then yes. That's a fair characterization of what the commission did as well. And with respect to not the negative use, but the affirmative use, where it seems to me there's also an argument that that's not what use means in trademark law, but there's also another argument that, of course it is. They're using our name in the course of this process. Wouldn't we have to – well, if you say it's a motion to dismiss standard that we're applying and we could dismiss the case with no affirmative use of their name. Right. Rescue.com says we couldn't dismiss the other claim. Right. So then you move to – so let's assume then that, in fact, their trademark claims are valid for purposes of the affirmative use. What the rule of reason says then, okay, you move to the third step of the rule of reason. Could they have protected their trademarks in a way that is less anticompetitive than the way they did? And the commission found that, yes, at minimum, they could have required disclaimers. But doesn't that, you see, that's also a trademark law issue, is it not, whether that would sufficiently dispel the initial confusion? Because the argument that Mr. Fishbein was making is that, God help them, there are lots of people out there who are not as sophisticated even as I am about this market, and somebody might say, oh, I Google when I heard contact, not even read the disclaimers, not read anything. Top thing is this. Let's start from the top and work down. I click on that. Now, when they get to the website, they might learn to their happiness that they didn't get to 1-800-CONTACTS, which is what they were trying to do, but landed somewhere else by some mystery of the Internet, and that somewhere else serves their needs better. I get that. But we're not talking about the website. What the commission found is that my point is why is it wrong to think that there are lots of people out there who when they Google 1-800-CONTACTS doesn't realize that Google is not their friend and that Google is selling them out to advertisers, and so they just immediately click on the first thing without even reading it, because they think they got what they asked for, which is give me 1-800-CONTACTS website. If that was their claim, Your Honor, they did not show it before the commission. So they have to win their trademark's case before the commission in order to... They're the ones that put in the trademark as a justification. They need to make that when under antitrust law, the justification cannot just be theory. It cannot be just a cognizable and plausible justification. It has to be a justification in fact, and they failed to do that. There's really no weight to be given to the idea that this was a settlement at arm's length between two parties who presumably evaluated the merits of this claim and made a decision about how strong it was and what it would justify by way of relief. Because in order to survive later antitrust scrutiny, you would have to show that not just that this was a reasonable settlement that people made under the state of the law at the time, but that their claim was actually a valid claim that they would have won, and they would have won on the merits, and they would have won this relief. No, Your Honor. It's the part about that this is a reasonable settlement that the commission found is not correct. This was not a reasonable settlement. The commission then analyzed the whole trademark issue, which puts that in our lap, right? Again, to the extent that it saw what the trademark elements are and found that the agreement ban ads that could not possibly meet those elements. So to that extent, yes. That's just for the negative. You said for the negative use of the mark cases, there isn't even a use, and so that wouldn't survive a motion to dismiss an hypothetical trademark case. Therefore, we say that's just a direct, or the commission says, that's just a direct anti-competitive effect. But for the affirmative use, well, that's plausibly a use. And so we do another step, and we analyze the trademark claim to see if there really is confusion, or there could be a better way to cure it that's less restrictive, and because there is, it doesn't prevail. But every step of that analysis is a litigation of the trademark claim. In that sense, it is. But that's what is required. If the defendant puts in a justification, the justification... To reach the commission's conclusion here, we need to litigate the underlying trademark claim. To the extent, again, you need to opine on the trademark claim to the extent that you say the negative keyword is not even a use, so you cannot have a claim there, and that for purposes of the affirmative use of the trademark, any confusion, because it's de minimis, there are people that in fact would do that, but there is evidence in the record that that confusion was de minimis. And for de minimis confusion, the way to rectify that is not by banning the ad altogether. It's by tailoring the remedy to the trademark problem. So putting in a disclaimer that says we're not affiliated with 1-800-CONTACT would have solved that problem. And what I hope is at least my last question. Suppose we were to think that with respect to the negative use, that's not even a use. That's like somewhere out of the furthest left field of trademark law, and they shouldn't be allowed to do that. That's something they could never have gotten in litigation. But that the issue of whether consumers are confused or not is something that was a legitimate ground of litigation at the time, that the parties made a decision about how that should be settled, and that we should not go back and revisit that in the guise of antitrust law. What happens then? I realize you think that's not anything like what you're going to decide, but if we were to decide something like that, as Ms. Fishbein says, the commission didn't make a case about the effect of curtailing negative ads, and is that important enough to be an antitrust violation or whatever. Do you get another chance then, another bite at the apple to do that? I can give you a two-part answer. The first one is you absolutely can just send it back to the commission and say deal with the negative keyword. But to tell you how important the negative keyword provision is, because if you only strike that negative keyword, if you only strike that provision, their entire case collapses and competition is brought back. Memorial Eye was one of the examples of their rivals. Memorial Eye did not bid on their trademark. They bid only on generic, but they refused to put in a keyword, and they stole customers left and right and center from 1-800. Because if I'm a consumer and I put in 1-800 contacts, I'm going to see the Memorial Eye ad. So what you think we should do if we were to reach that conclusion that you don't want us to reach would be to modify the order and affirm it, that is to submit it to that, and the record would support that. Absolutely, the record would support that. I think this is maybe my last question. So you said this example of Memorial Eye. So as we said in Clorox, antitrust law protects competition and not competitors. I understand Memorial Eye is not getting as much customers because they're not doing this advertising because of this agreement they signed. But there are a bunch of other online retailers that are bidding on the keyword. So why isn't it the case that those customers that otherwise went to Memorial Eye are now going to these other lower-cost online sellers as opposed to going to 1-800 contacts? No, we're talking about, remember, the claim is for a consumer that puts in 1-800 contacts in the search engine. Right, and you get an ad for Memorial Eye. You can get it. You click on it, and you go buy at Memorial Eye under your theory because it's cheaper and you like it better. But Memorial Eye can't do that anymore because they signed an agreement. Well, Memorial Eye can't do it anymore because they're out of business because after they signed the agreement, they went out of business. So then it's even stronger because Memorial Eye is not going to ever do that ever again regardless of the result of this case. But aren't there a whole bunch of other online retailers that did not sign these agreements with 1-800 contacts that do, in fact, advertise on the keywords? And so if they are selling under the price that 1-800 contacts offers, aren't we just talking about people who otherwise go to Memorial Eye are going to some other advertiser? So remember, Your Honor, that the agreements cover almost 80% of the market. So those are the great majority of retailers in that market are covered by those agreements. What would happen if you were to only invalidate the negative keyword requirement is all of those rivals' advertisements would still show up. If they bid on only generic and somebody's searching for 1-800 contacts, then their ads would show up. That's what Google does because they're relevant. So in that sense, it would solve a big part of that competition problem. So it's not about one rival. It's the fact that these restraints completely ban advertising for the great majority of the market. Completely ban it on the 1-800 contacts mark, right? That's the only thing. I'm going to get them. And if I search 1-800 contacts, I might actually get them in the search results, right? Absolutely. The advertisements are right at the top of the search. Right, but the commission also found that consumers, in fact, one-third of consumers that were surveyed were not aware of any other online brand other than 1-800 contacts. So 1-800 contacts, the search for 1-800 contacts, covers almost 17% of all searches for online contacts. Seventeen or seventy? Seventeen. But it's as much 1-800 contacts alone is as much as searching for contact, contact lenses, lenses. There's a study in the record that says that most of those people who are searching for 1-800 contacts are doing so with navigational intent, right? So typing in 1-800 contacts into Google is just like typing 100contacts.com to get the website. And that's sort of weird quirk of Internet use that people Google a thing instead of just typing in the address, right? But there are also a lot of people that are searching for 1-800 contacts because that's the only brand they know of online contact lenses, but they know that online lenses are cheaper. And so they put in 1-800 contacts to see what comes up. I mean, as your Honor mentioned and as your Honor mentioned, there is a reasonable expectation now that when you put in a term in a search engine, you're going to get ads that are relevant to that search. Some are not even relevant, but you certainly will get ads are relevant. So there may be some people that are using 1-800 contacts only to reach its own website, but there are also a lot of people that put in 1-800 contacts just to buy online lenses.  Thank you, Your Honor. Mr. Cushman. Your Honor, the implication of the FTC's position that we have to reexamine the merits of the trademark claims is extraordinary. And let me point out two things. One is that that relitigation is not only a question of law, but a question of fact because it's the likelihood of consumer confusion. So you have to go back to 2004, 2009, to whatever the settlement was, Vision Direct, and recreate surveys of whether people would be confused or not? That certainly applies to the argument about something that is concededly or at least will pass muster in this circuit as a use. But with respect to something that may not pass the motion to dismiss stage, it wouldn't require any of that, right? Yes. And on that point, going back to what I said, it can't be that some novelty or uncertainty in the law would make settlement subject to antitrust review. Why couldn't it be in the sense that this is all a long time ago, right? The law evolves and the law changes. Now, if you enter a settlement agreement that 10 years later you regret because it turns out that somebody else actually litigated that case and won, the case that you could have litigated, you're still stuck with the agreement. That's fine because that's as between you and your adversary. But this isn't one of those adversaries trying to get out from under something they voluntarily agreed to. This is a government agency that has an interest in protecting consumers in the antitrust space. And it seems to me that's a rather different thing when years later it turns out that a lot of competitors folded and now the law looks a lot different and we still have these legacy agreements that hurt consumers, not the other people who signed them. I would say two things. Obviously, the interest in settlement is very strong. People settle cases precisely because the law is uncertain. And if the situation was that the more uncertainty, the more likely it is that my settlement will be challenged, it's a disincentive to settle. It's also true that if it is correct that the law has changed to such a degree that you could not sue anybody today and win, then I should get out of the judge business, go into the online contact lens business because it's a great space for me to open up. But maybe that's true and maybe it's not. And the best proof of that is what's in the market. If somebody else is going to now challenge you on the ground that, yeah, you managed to beat these other people down because they were unwilling to fight, now lens.com has paved the way and the rest of us can get into this market and we'll be braver about facing any claim of yours that we shouldn't be allowed to do this. And that has not happened. And I also want to comment that the FCC said this is prospective only. That's not really true. We're facing massive class action liability based on this FCC judgment. If this court were to conclude that from today going forward the law has changed enough that perhaps some provisions should be modified, that has to be made really clear because we cannot be facing these hundreds and hundreds of millions of dollars of liability based on the order which purports to say these were illegal when we entered them. Another point. Do you agree that the use of negative keywords wouldn't survive a motion to dismiss it? I do not agree. And what I explained before, functionally it is exactly the same. It is causing an ad to run against my trademark. In Rescue.com they pointed to two factors that made it use. One was that the ad was triggered by an actual trademark and not a URL. That's true with broad matching. And the second which distinguished it from pop-up ads because there was a prior case on pop-up ads was that the advertiser had some discretion and control over which words their ad ran against. And that is true in the case of broad match because it's the advertiser that selects broad match versus exact match. And as I said, in other words, this is not accidental advertising on our trademark. They deliberately in this memorial I testified to this. They deliberately chose the broad match knowing that the ad would run against ours. That's a use. And clearly, you know, it was plausible that would survive a motion to dismiss. So I think we are on safe ground there. As I understood one of the main arguments from the FTC is this sort of over breadth that the settlements restrict advertising regardless of content. But that is our claim. Our claim is that there is confusion notwithstanding what the content is. Rescue.com stands for that. He said there were no cases. Soilworks is a judgment on the merits that stands for that. Australian Gold stands for that. Hearts on Fire stands for that. We have numerous cases that saying irrespective of the content, the mere placement of an ad immediately below the search is confusing. And then finally on this issue of we are not 1-800 contacts because I think in terms of the over breadth and in terms of what the FTC is saying we should have done, that's kind of what it comes down to. And I think your honors understand this. Not a single witness in the FTC said if only we could run an ad that said we are not 1-800 contacts. There is not evidence that the other competitors that were not bound by these agreements view that as a significant search term. We are not 1-800 contacts. The settlement agreements each have a term that says prohibited acts shall not include use of the other party's trademark on the Internet in a manner that would not constitute an infringing use in a non-Internet context, e.g. the use of the Internet for comparative advertising. So comparative advertising is flagged in the settlement agreement as a permitted use. Now granted there may be some ambiguity as to whether an ad saying we're not 1-800 contacts would fall within that. No one came to 1-800 contacts and said we would like to run that ad. We think it falls within that provision. And also the agreement allowed an ad that said we are better than 1-800 contacts because that's the comparative use, right? Sure. Nevertheless, the parties seem to think that resolving the litigation required more than that. Is that correct? You certainly could run an ad saying we are better than 1-800 contacts in social media, display ads, and all these other channels. If you ran an ad we are better than 1-800 contacts in response to our trademark, I think the counterparty would have to – Those are two different issues, whether it's in response to the trademark and whether the content of the ad says we're better than 1-800 contacts. Oh, that's fine. That's absolutely – the content of the ad is not prohibited by this agreement at all. What I'm saying is even if you wanted to run that against a search for 1-800 contacts, arguably under the agreement you could do that. And my point is no one came to us and said we'd like to do it because this is just a completely unrealistic scenario. And so, for example, in Clorox they had the same option. They could have sort of said, okay, Pine Sol, the solution here is not that you can't sell a disinfectant. You have to say on the bottle we are not Lysol. But the court didn't get into that because the parties are in the best position to assess what's commercially reasonable, and no party here thought that ad saying we're not 1-800 contacts was commercially reasonable. I think my time is up unless there are other questions. Thank you. Thank you, Mr. Fishbein, Mr. Abiodun. The arguments are much appreciated. We'll reserve decision. Thanks very much. Good day.